IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SUSAN GALLO,                                    )
                                                )
        Plaintiff,                              )    No. 09 C 0649
                                                )
        v.                                      )    Magistrate Judge Mason
                                                )
MICHAEL J. ASTRUE,                              )
        Commissioner of Social Security,        )
                                                )
        Defendant.                              )

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

        Presently before this Court is plaintiff Susan Gallo's ("Gallo" or "claimant") motion

for summary judgement [19] seeking judicial review of the final decision of the

Commissioner of Social Security ("Commissioner") denying her claim for disability

insurance benefits under the Social Security Act ("Act"), 42 U.S.C. §§ 416(i) and 423.

(R. 62).  The Commissioner filed a cross motion for summary judgment [23] seeking this

Court to uphold the decision of the Administrative Law Judge ("ALJ").  This Court has

jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g).  For the reasons set forth

below, Gallo's motion for summary judgment is denied, and the Commissioner's cross-

motion for summary judgment is granted.

**I.      BACKGROUND**

        **A.      Procedural History**

        Gallo filed an application for Disability Insurance Benefits ("DIB") on May 11,

2006 alleging disability beginning on June 30, 2005.  (R. 48).  Her application was

denied initially on June 30, 2006 and again on October 12, 2006 after a timely request

for reconsideration. (R. 48-49). Gallo requested a hearing, which was held on April 8,

2008 before ALJ John Pope ( the "ALJ" or "ALJ Pope"). (R. 9-47). ALJ Pope issued a

written decision denying Gallo's request for benefits on August 25, 2008. (R. 62). The

Appeals Council subsequently denied Gallo's request for review on December 4, 2008,

and ALJ Pope's decision became the final decision of the Commissioner. *Estok v.

Apfel*, 152 F.3d 636, 637 (7th Cir.1998). Gallo subsequently filed this action in the

district court.

## B.    Medical Evidence[1]

### 1.    Dr. Ellen Voronov – Lower Back Pain

On May 24, 2005, about one month before claimant's alleged onset date, Dr.

Ellen Voronov ("Dr. Voronov"), of M & M Orthopaedics, conducted a follow-up

examination concerning claimant's recent bilateral medial branch block procedure to

treat recurring pain in her lower back. (R. 188). Claimant had been receiving treatment

from Dr. Voronov for recurring lower back pain since the beginning of December 2004.

(R. 193). Claimant reported relief of her lower back difficulties after the procedure.

(*Id*.). Although she reported intermittent subjective parethesia in her bilateral lower

extremities, her sensation was intact in the L2-S1 dermatomes. (*Id*.). On May 24,

2005, Dr. Vorovnov found that claimant did not demonstrate any tenderness at the

---

[1] Claimant attributes at least part of her disability to back and wrist injuries she suffered as a result of a car accident which occurred on April 18, 2004. (R. 200). The record includes voluminous medical evidence from many different providers, which the ALJ discussed. (R. 55-60). For the purposes of clarity and brevity, we concentrate on the medical evidence during the relevant time period, i.e., immediately before claimant's alleged onset date through August 25, 2008, the date ALJ Pope issued his decision. On March 8, 2010, this Court took judicial notice that claimant requests that the time period at issue be limited to June 30, 2005 through August 25, 2008 [30].

injection site or any perilumbar tenderness.  (*Id*.).  She had full range of motion of her lumbar spine.  (*Id*.).  Dr. Voronov also reaffirmed claimant's diagnoses of "degenerative disease of the lumbar spine."  (*Id*.).  In addition to continuing with her current medication, which included taking Celebrex regularly for pain and Ultracet as needed for pain, Dr. Voronov prescribed claimant with Neurontin for pain and encouraged her to exercise, suggesting a trial in water aerobics.  (*Id*.).

Claimant returned to see Dr. Voronov on September 14, 2005 with complaints of intermittent lower back pain, especially at the extremes of physical activity.  (R. 186). Again, she had no radicular symptoms.  (*Id*.).  She demonstrated no perilumbar tenderness.  (*Id*.).  Dr. Voronov found that claimant had some stiffness in her lower back with extension, but otherwise demonstrated a full range of motion of her lumbar spine with some stiffness.  (*Id*.).  Additionally, Dr. Voronov noted that claimant had found aquatic aerobics beneficial to relieve her lower back pain.  (*Id*.).  Claimant also reported that Neurontin provided relief of paresthesias in her lower extremities.  (*Id*.).

On October 27, 2005, claimant complained to Dr. Voronov of recurring lower back pain in the previous three weeks, with some pain occasionally radiating to her buttocks.  (R. 185).  However, she reported that she did not feel tingling or numbness in her lower extremities.  (*Id*.). Claimant expressed discomfort with range of motion of the lumbar spine in all directions.  (*Id*.).  She had been continuing with daily doses of Celebrex and Neurontin, and doses of Ultracet as needed, while occasionally taking half a tablet of Darvocet for acute pain.  (*Id*.).  Claimant reported that these medications had not produced any side effects.  (*Id*.).  Because claimant had previously found a medial branch block beneficial, Dr. Voronov scheduled claimant for another.  (*Id*.).

On November 14, 2005, claimant received a second medial branch block to treat the pain in her lower back. (R.241). She returned to Dr. Voronov for a follow-up on November 17, 2005. (R. 184). Claimant reported some residual aching, but no pain in the lower back. (*Id.*). She again reported that there were no side effects as a result of her regularly taking Celebrex and Ultram and occasionally taking Darvocet. (*Id.*). When Dr. Voronov conducted a physical examination, claimant did not demonstrate any perilumbar tenderness, and she had a full range of motion of the lumbar spine without any discomfort. (*Id.*). Dr. Voronov again recommended that claimant participate in aquatic aerobics and continue her home exercise program. (*Id.*).

Claimant visited Dr. Voronov again on April 4, April 27, May 5, and October 18, 2006. (R. 176-183). On April 4, 2006, claimant reported doing reasonably well until two weeks prior. (R. 180). Before the two weeks prior to the April 4 appointment, she reported on and off aching and occasional mild pain in her lower back. (*Id.*). She also explained that she did not suffer from any numbness or tingling in her lower extremities at any time. (*Id.*). Claimant asked about receiving another back injection because that procedure had been beneficial in the past. (R. 182). Dr. Voronov recommended that she first try taking Medrol Dosepak for pain instead of Celebrex and undergo an MRI. (*Id.*).

On April 27, 2006, claimant returned to Dr. Voronov to discuss the results of the MRI on her lumbar spine and the Medrol Dosepak trial. (R. 178). Dr. Voronov noted that claimant's condition had improved. (*Id.*). Claimant reported a decrease in the intensity and frequency of her lower back pain. (*Id.*). She had not been having any pain at night. (*Id.*). She had no perilumbar tenderness, but expressed some discomfort with

flexion of the lumbar spine. (*Id.*). Her MRI of the lumbar spine demonstrated "Grade I/II anterolisthesis at L4-L5 grossly unchanged." (R. 179). Dr. Voronov noted that claimant had not been taking calcium supplements despite being directed to do so previously by her primary care practitioner. (*Id.*). Dr. Voronov asked claimant to undergo a bone density scan before her next appointment and also noted that claimant's use of a lower back brace may prove beneficial. (*Id.*).

Claimant reported that her lower back pain remained largely unchanged when she saw Dr. Voronov on May 25, 2006. (R. 177). She had no radicular symptoms and had no new complaints. (*Id.*). The bone density scan suggested osteopenic findings in her femurs, which is a precursor to osteoporosis. (*Id.*). Although the lower back brace seemed to provide claimant some relief, she had stopped using it. (*Id.*). Claimant again reported that her medication had not produced any side effects. (*Id.*). Dr. Voronov noted that claimant had persistent lower back pain, but also noted that claimant experienced a few months of relief resulting from a previous medial branch block procedure. (*Id.*). Dr. Voronov recommended that claimant schedule another medial branch block procedure and continue to take Celebrex regularly for pain, Ultracet as needed for mild pain, and Darvocet as needed for acute pain. (*Id.*).

Claimant received another medial branch block on July 17, 2006. (R. 224, 233). She followed up with Dr. Voronov on October 18, 2006. (R. 284). Claimant reported that she had been experiencing occasional, centralized lower back pain at a severity of five or six out of ten. (*Id.*). She had not experienced any radicular symptoms and made no new complaints. (*Id.*). Claimant demonstrated some stiffness with extension of her lumbar spine, but she had full flexion, lateral bending, and bilateral rotation. (*Id.*). She

had no focal deficit. (*Id.*). Her motor and neurovascular examination was normal. (*Id.*). Dr. Voronov noted that claimant was "doing reasonably well" with her current medication and specifically noted that a combination of Ultracet and Darvocet for pain, "seemed to provide [claimant] relief." (*Id.*). Claimant also reported that she had not been consistently performing her home exercise program. (*Id.*). Dr. Voronov encouraged her to proceed with the home exercises on a regular basis and recommended another trial of aquatic aerobics for which he provided a referral. (*Id.*).

A little over a month later, on January 10, 2007, claimant reported that she had completed aquatic aerobics therapy and had been performing home exercises on a regular basis. (R. 281). Claimant reported improvement in her discomfort. (*Id.*). She experienced some residual aching in the lower back. (*Id.*). However, she described it as "mild and quite tolerable." (*Id.*). She reported occasional episodes of lower back pain, but they were "low in frequency." (*Id.*). According to claimant, she felt improvement in her functional status and was able to tolerate physical activities during the day better. (*Id.*). She reported no new difficulties. (*Id.*).

On January 10, 2007, claimant had been taking Celebrex for pain as directed by her primary care physician. (R. 282). She had also been taking one tablet a day, on alternating days, of Ultracet and Darvocet for pain, and one tablet a day of Neurontin for pain. (R. 281). She again reported that this combination of medication did not produce any side effects. (*Id.*). Claimant also told Dr. Voronov that "the combination of the above medication seem[ed] to provide her good relief of residual difficulties," and that "she [was] pleased with her improvement." (*Id.*). Dr. Voronov directed her to continue taking Celebrex for pain as directed by her primary care physician and to continue

taking Ultracet and Darvocet for pain, but only as needed. (R. 282). Additionally, Dr. Voronov directed claimant to continue taking Neurontin for pain once a day before bed and instructed her to continue with regular home exercises. (*Id.*).

In 2007, claimant saw Dr. Voronov three more times on April 18, July 18, and October 17. (R. 325, 322, 319). On April 18, 2007, Dr. Voronov noted that claimant was "doing reasonably well with a combination of [her] home exercise program and trial of her pharmaceuticals." (R. 325). Claimant reported having occasional centralized lower back pain, but having "significantly more good days" than bad. (*Id.*). She had no radicular symptoms. (*Id.*). Claimant had no perilumbar tenderness. (*Id.*). She had a full range of motion of the lumbar spine, but experienced some discomfort and stiffness with extension of the lumbar spine. (*Id.*). She did not have any new complaints. (*Id.*). In the previous weeks, claimant had been gradually slowing the frequency with which she took Darvocet, the strongest of her pain medications. (*Id.*). She asked that she be allowed to discontinue taking Darvocet altogether. (*Id.*). Dr. Voronov directed claimant to continue taking Celebrex, Neurontin, and Ultracet for pain and to continue with her home exercise program. (*Id.*).

During her July 18, 2007 visit, claimant stated that she was able to tolerate her physical activities during the day and that "she [was] reasonably fine at [that] time." (R. 322). Further, Dr. Voronov noted that claimant was "doing reasonably well." (*Id.*). Claimant reported that, for the most part, she suffered from residual aching in her lower back, but at times she experienced minimal pain. (*Id.*). She rated her lower back pain at two out of ten. (*Id.*). She did not have any radicular symptoms. (*Id.*). She continued to take Celebrex, Neurontin, and Ultracet for pain. (*Id.*). She was taking one half tablet

of Darvocet for pain, at most, once a week.  (*Id.*).

Claimant returned to Dr. Voronov for a checkup on October 17, 2007.  (R. 319).
She reported that she had recently been diagnosed with hypertension by her primary
care practitioner.  (*Id.*).  Again, Dr. Voronov noted that claimant was doing "reasonably
well with her home exercise program and the combination of pharmaceuticals." (*Id.*).
Claimant reported minimal aching in her lower back during the day.  (*Id.*).  At extremes
of physical activities, she rated pain in her lower back at two out of ten.  (*Id.*).  She had
no pain in her lower extremities.  (*Id.*).  She continued to take Celebrex, Neurontin,
Ultracet, and occasionally, Darvocet for pain.  (*Id.*).

Finally, claimant saw Dr. Voronov three times in 2008 on February 27, April 30,
and May 21.  (R. 310, 335).  At her February 27 appointment, claimant reported that she
had been diagnosed with hemochromatosis, a blood disorder, since she had last seen
Dr. Voronov on October 17, 2007.  (R. 310).  In addition, she had also been diagnosed
with arthritis, secondary to hemochromatosis, by Dr. Maria Sosenko ("Dr. Sosenko"), a
rheumatologist.  (*Id.*).  In regards to her lower back pain, claimant reported that she had
been doing reasonably well with occasional aching in her lower back.  (*Id.*).  She had
been taking Ultracet and Darvocet only as needed.  (*Id.*).  However, in the two weeks
prior to the February 27, 2008 appointment, claimant reported that her lower back pain
had become exacerbated.  (*Id.*).  She rated her lower back pain at five out of ten with
some radiation into the back side of her thighs.  (*Id.*).  Dr. Voronov noted that claimant
experienced discomfort and mild pain with extension of the lumbar spine.  (*Id.*).
However, there was no discomfort with the extremes of range of motion of her lumbar
spine.  (*Id.*).   She had mild perilumbar tenderness in her lower back, but was able to

walk on her heels and toes without difficulty. (*Id.*).

Claimant admitted that she had recently been unable to attend aquatic aerobics on a regular basis. (R. 311). However, she stated that she intended to resume regular aquatic aerobics at a local fitness facility. (*Id.*). She also reported that she had failed to consistently perform her home exercise routine. (*Id.*). Dr. Voronov encouraged her to resume the performance of both. (*Id.*). Dr. Voronov directed her to continue taking Neurontin regularly for pain and to take Ultracet and Darvocet for pain as needed. (*Id.*).

Claimant returned to see Dr. Voronov for a follow up appointment on April 30, 2008. (R. 335). Her complaints, presentation, evaluation, and examination remained unchanged from her February 27, 2008 visit. (*Id.*). She rated her lower back pain at five out of ten. (*Id.*). Claimant reported that she had again failed to resume aquatic aerobic therapy or to consistently perform her home exercises. (*Id.*). She explained that her schedule had become too busy due to the work up for her recently diagnosed hemachromatosis condition. (*Id.*). Dr. Voronov directed her to continue to take Neorontin for pain regularly and to take Ultracet for pain as needed. (*Id.*). Additionally, Dr. Voronov recommended a follow up MRI of the lumbar spine. (*Id.*).

Dr. Voronov saw claimant on May 21, 2008 to discuss the results of her MRI. (R. 336). Claimant reported that her lower back difficulties had improved. (*Id.*). Dr. Voronov noted that claimant's residual pain was minor. (*Id.*). Dr. Voronov also noted that claimant had resumed a consistent home exercise program and that the combination of consistent home exercise and current pain medication had made her minor pain "well tolerable." (*Id.*). Claimant demonstrated a full range of motion of the lumbar spine with minimal stiffness on extension. (*Id.*).

According to Dr. Voronov's notes, the MRI of claimant's lumbar spine revealed nothing new.  (R. 336).  She had chronic, mild compression of the superior endplate of L5.  (*Id.*).  There was a 1.2 centimeter anterior subluxation, L4 on L5, with associated pseudobulge and facet changes.  (*Id.*).  She had moderate to severe narrowing of the spinal canal.  (*Id.*).  Dr. Voronov directed claimant to continue to take Neurontin regularly and suggested a trial of Ultram for pain instead of Ultracet and Darvocet.  (*Id.*).  Dr. Voronov also encouraged claimant to continue with her home exercise program and to return for an appointment as needed.  (*Id.*).

## 2. Wrist Pain – Dr. David Tulipan

Claimant saw her hand and wrist specialist, Dr. David Tulipan ("Dr. Tulipan"), of M & M Orthopaedics, on September 8, 2005.  (R. 187).  Claimant reported some diffuse pain in her right wrist after heavy lifting, twisting, or gripping.  (*Id.*).  Although nothing showed up on an MRI, Dr. Tulipan noted a "little midcarpal instability" that may have been caused by a hyperextension injury to the right wrist resulting from claimant's car accident in May 2004.  (*Id.*).  Dr. Tulipan recommended treatment with a steroid injection, but advised claimant that she may have to make some activity modifications in her lifestyle to try and limit the pain if the injection proved ineffective.  (*Id.*).

On December 14, 2006, claimant returned to see Dr. Tulipan and received a steroid injection in her right wrist.  (R. 282).  Dr. Tulipan noted that if claimant continued to have pain in her right wrist after the injection, claimant might consider arthroscopic surgery on the wrist.  (R. 282-283).  Dr. Tulipan also noted that claimant had basal joint arthritis in her right wrist and that the surgery would not relieve any discomfort resulting from the arthritis.  (R. 283).

10

Claimant next saw Dr. Tulipan on June 18, 2007. (R. 279). Claimant reported that she felt "quite pain free for three or four months" following the steroid injection to her wrist in December 2006. (*Id.*). However, the pain had gradually returned. (*Id.*). Claimant told Dr. Tulipan that she did not wish to have surgery on the wrist at that time and requested that he instead give her another steroid injection. (*Id.*). Dr. Tulipan gave her another injection. (*Id.*).

Although claimant next visited Dr. Tulipan after the date of her ALJ hearing, we find discussion of the visit informative. On September 11, 2008, Dr. Tulipan noted that claimant had been recently diagnosed with porphyria cutanea tarda ("PCT") and hemochromatosis, both blood disorders, and that these blood disorders are associated with the underlying arthritis related to some of the pain in her right wrist. (R. 338). Dr. Tulipan found that claimant's pain in her right wrist was no longer in the same part of her wrist as it was before. (*Id.*). He found that she had no carpal instability. (*Id.*). Dr. Tulipan also noted that she had diffuse wrist pain and some pain radiating into her fingers. (*Id.*). A new x-ray of the wrist showed the previously discovered severe degenerative changes at claimant's basal joint, but did not show any obvious intercarpal problems. (*Id.*). Dr. Tulipan noted that he no longer thought that surgery on the wrist would be beneficial. (*Id.*). He gave claimant another steroid injection in her right wrist. (*Id.*). Dr. Tulipan suggested that she continue to see her rheumatologist and receive treatment. (*Id.*). He directed claimant to return and see him on an as needed basis. (R. 337).

### 3. Blood Disorders and Arthritis – Dr. Leela Rao and Dr. Maria Sosenko

Claimant had noticed blisters on her hand around the middle of September 2007. (R. 298). After cortisone cream did not help heal the blisters, she consulted a dermatologist and underwent a biopsy. (*Id.*). On October 30, 2007, claimant first saw Dr. Leela Rao ("Dr. Rao"), a hematologist practicing at Joliet Oncology-Hematology Associates, Ltd., because the biopsy had revealed that she was suffering from PCT. (*Id.*). Dr. Rao noted that claimant had also been suffering from hot flashes, mood swings, and depression associated with menopause. (*Id.*). In an effort to alleviate these symptoms, claimant had been taking bio-identical hormones through an alternative medicine physician since March 2007. (*Id.*). Dr. Rao found that, as a result of the hormones, she had resumed periodic menstruation and had experienced weight gain. (*Id.*). In the few weeks prior to the October 30, 2007 appointment, claimant had cut her hormone dosage in half. (*Id.*).

Dr. Rao noted that claimant did not have any kyphosis or scoliosis – both spinal curvature disorders – or compression fractures in her back. (R. 299). Additionally, claimant had a normal range of motion in her back and had neither tenderness nor swelling in her back. (*Id.*).

Dr. Rao noted that the photosensitivity blisters on claimant's fingers were a result of PCT, but also noted that claimant's use of bio-identical hormones was a participating factor. (R. 299). Dr. Rao recommended that claimant begin to wean off the hormones and eventually discontinue their use altogether. (*Id.*). Dr. Rao also directed claimant to receive a phlebotomy treatment every week for four weeks. (*Id.*). A phlebotomy treatment is a process where an amount of blood is removed from claimant's body. (R. 330). Dr. Rao also noted that claimant would likely need to start taking Effexor, an

anti-depressant, when she had fully discontinued taking the hormones. (R. 299).

On November 27, 2007, Dr. Rao commented that claimant had only undergone one phlebotomy despite Dr. Rao's previous recommendation that she undergo one phlebotomy every week for one month. (R. 296). Claimant reported that at her first phlebotomy, she developed hypotension and required intra-vascular fluids to resolve the issue. (*Id.*). Claimant had not consented to another phlebotomy. (*Id.*).

Dr. Rao noted that the blisters on her right hand had slowly healed since she stopped hormone replacement therapy in November 2007. (*Id.*). Claimant reported that her primary care physician had given her samples of Effexor, but claimant remained ambiguous about whether she had actually used them. (*Id.*). Dr. Rao recommended that claimant try another phlebotomy. (*Id.*). He thought that she might tolerate the treatment better if she held off taking any medication for hypertension on the day of the treatment and if only 300 milliliters of blood were removed per treatment. (*Id.*). Dr. Rao also recommended that claimant try regularly taking Effexor for perimenopausal symptoms. (*Id.*).

Claimant's last documented visit to Dr. Rao occurred on December 14, 2007. (R. 294). Dr. Rao noted that despite her recommendation, claimant still had not consented to another phlebotomy treatment. (*Id.*). However, her blisters had fully healed and there was no new rash or discoloration. (*Id.*). Dr. Rao further noted that claimant still experienced hot flashes, insomnia, and uncontrolled itching of the skin. (*Id.*). Since her last appointment with Dr. Rao, claimant had been taking the Effexor regularly for perimenopausal symptoms. (*Id.*). Dr. Rao recommended that claimant undergo phlebotomy treatments every two weeks, but also recommended that plaintiff try the

medication Exjade, a drug that removes excess iron from the blood, as an alternative to the phlebotomies. (R. 295). Dr. Rao also advised claimant to avoid iron rich foods. (*Id.*).

Claimant visited Dr. Sosenko, a rheumatologist practicing at Prairie Rheumatology Associates, S.C., around February 26, 2008. (R. 312). Dr. Sosenko noted that, in her opinion, some of claimant's arthritis was related to hemochromatosis. (*Id.*). Claimant reported that she suffered from more arthritis "than one would expect" in her spine on previous x-rays. (*Id.*). She also reported that she had been diagnosed with osteopenia. (*Id.*). Dr. Sosenko noted that claimant had been doing "quite well" with Celebrex and should continue using Celebrex for pain as long as her renal function remained good. (*Id.*). Dr. Sosenko recommended that claimant take calcium and vitamin D supplements in addition to the Boniva she had been taking. (*Id.*). Dr. Sosenko noted that claimant may be vitamin D deficient as a result of PCT. (*Id.*). She also encouraged claimant to exercise more and suggested a six week trial of Cosamine DS or Osteo-Biflex for pain in her joints. (*Id.*).

### 4. Physical Residual Functional Capacity Assessment – Dr. Henry Bernet

On June 29, 2006, Dr. Henry Bernet ("Dr. Bernet"), the state agency consultant, completed a physical residual functional capacity ("RFC") assessment of claimant. (R. 212-219). Dr. Bernet found that claimant could occasionally lift or carry twenty pounds and frequently lift or carry ten pounds. (R. 213). He also found that, with normal breaks, claimant could stand or walk for about six hours in an eight hour workday and could sit for about six hours in an eight hour work day. (*Id.*). Additionally, he noted that

claimant could frequently climb stairs or ramps and perform balancing.  (R. 214).  In completing claimant's physical RFC assessment, Dr. Bernet concluded that claimant was capable of "light work with occasional, crawling, kneeling, crouching, stooping, [and] climbing of ladders, scaffolds, and ropes."  (R. 219).

### C.    Claimant's Testimony

Gallo was born on June 22, 1958, and was 49 years old at the time of the hearing. (R. 14).  She testified that she lives with her husband and her nineteen year old son.  (R. 14).  At the time of the hearing, she was five foot six inches and approximately 160 pounds.  (*Id*.).  She graduated from high school and has no vocational training.  (R. 15).  She is right-handed. (*Id*.). She had owned a bar with her husband and last worked at the end of December 2004 as a bartender at the bar.  (*Id*.).  She did not participate in any managerial functions at the bar.  (R. 16).  Claimant and her husband sold the bar in June 2005.  (R. 15).  She testified that she has not looked for any kind of work since December 2004.  (R. 16).

Claimant testified that she stopped bartending in December 2004 because she could no longer perform the physical aspects of the job due to pain in her back and wrist.  (R. 16).  She explained that the effects of degenerative disc disease and spondylolisthesis produce a constant "achy pain" in her back that keeps her from being able to work.  (R. 35-36).  The disorders sometimes cause an "achy pain" or a "burning pain" that radiates to her buttocks and to the back of her legs down to her knees.  (R. 17, 35-36).   Claimant also testified that she has osteoporosis in her back and hips.  (R. 18).  She sometimes has numbness and tingling in her left foot three to four times a week.  (R. 35-36).

15

Additionally, she testified that she suffers from two blood disorders, hemochromatosis and PCT. (*Id.*) The hemochromatosis causes her to suffer from arthritis in her hands. (R. 35). She has pain in her knuckles on both hands, especially the knuckle of her right index finger. (*Id.*). As treatment for the blood disorders, she claimed that she receives phlebotomy treatments which cause her to be fatigued. (R. 28). She also claimed to have pain from carpal instability in her right wrist. (R. 18, 35). Taken together, claimant testified that her medical problems prevent her from working. (*Id.*). She claimed to have problems standing, sitting, and walking. (*Id.*). She explained that she does not lift anything over five pounds and that she cannot push anything. (R. 19).

Claimant testified that she was in a car accident in April 2004. (R. 20). From April 2004 through September 2004, she had her arm in a cast and underwent physical therapy for her arm and wrist. (*Id.*). Claimant explained that in April 2004, after the accident, she saw Dr. Sanders, an orthopedic doctor who had treated her for unrelated knee conditions prior to the accident. (R. 23). Claimant testified that Dr. Sanders recommended that she either have back surgery or stop bartending. (*Id.*).

Claimant testified that she had also seen Dr. Tulipan[2] since July 2004. (R. 22). Claimant started to complain of pain in her right wrist after her arm cast had been removed (*Id.*). Claimant testified that Dr. Tulipan treated her for carpal instability with steroid injections twice a year. (R. 22). As of the time of the hearing, claimant

---

[2] In claimant's ALJ hearing transcript cited in the record, she refers to a "Dr. Tulipen". We assume that this spelling of Dr. David Tulipan's name is an error on the part of the court reporter. This Court's opinion is written under the assumption that the "Dr. Tuilpen" referred to in the transcript of claimant's hearing testimony and the Dr. David Tulipan cited in the medical records are the same person.

explained that Dr. Tulipan had stopped offering her steroid injections. (R. 23). Instead, he was recommending wrist surgery. (*Id.*).

In October, 2004, Dr. Tulipan referred claimant to Dr. Mather, another orthopedic doctor specializing in spines. (R. 19). Claimant saw Dr. Mather one time; Dr. Mather referred her to Dr. Voronov[3], a pain management doctor. (R. 20). At the time of the hearing, claimant testified that she saw Dr. Voronov every two to three months. (R. 21). Claimant explained that Dr. Voronov had given her three epidural shots throughout the course of her treatment. (R. 21). Dr. Voronov also gave her what claimant called a "block," which she explained as four injections which helped to block the pain beginning in her back. (*Id.*). Additionally, claimant testified that Dr. Voronov prescribed pain medication to her, occasionally assisted her with physical therapy, and had put her on a five-pound lifting restriction. (R. 21, 26).

Claimant also testified that she had been treated for two blood disorders by Dr. Rao[4], a hematologist, since October, 2007. (R. 24). She explained that she was initially seeing Dr. Rao more frequently, but that at the time of the hearing she was seeing Dr. Rao about once a month. (R. 24-25). She explained that as a result of the blood disorders, her arms sometimes itch and burn, especially when she is stressed. (R. 35). Claimant testified that Dr. Rao recommended that she go to the hospital twice a month

---

[3] In claimant's ALJ hearing transcript cited in the record, she refers to a "Dr. Vornoff". We assume that this spelling of Dr. Ellen Voronov's name is an error on the part of the court reporter. This Court's opinion is written under the assumption that the "Dr. Vornoff" referred to in the transcript of claimant's hearing testimony and the Dr. Ellen Voronov cited in the medical records are the same person.

[4] In claimant's ALJ hearing transcript cited in the record, she refers to a "Dr. Rau". We assume that this spelling of Dr. Leela Rao's name is an error on the part of the court reporter. This Court's opinion is written under the assumption that the "Dr. Rau" referred to in the transcript of claimant's hearing testimony and the Dr. Leela Rao cited in the medical records are the same person.

to receive a phlebotomy to treat the two blood disorders.  (R. 25).  She explained that a phlebotomy was a procedure where a physician will "withdraw blood from [her]" and "throw it away."  (*Id.*).  Claimant further explained that these phlebotomy treatments result in fatigue and make her "almost anemic."  (R. 26).

Claimant testified that she was taking the following medications for her multiple medical disorders: (1) Vitamin D prescription, (2) Osteo Bi-Flex, (3) Citrucel with D, (4) Boniva, (5) Darvocet, (6) Ultracet, (7) Celebrex, (8) Lisinopril, and (9) Gabapentin.  (*Id.*) She explained that she thought the medications were helping her, but that they made her fatigued "all the time."  (R. 27).  Additionally, the Darvocet would occasionally cause constipation.  (*Id.*).  In addition to medication, she testified that lying down or sitting with her legs up sometimes alleviates her back pain.  (R. 35).

Claimant also testified that "she gets depressed a lot."  (R. 33).  She believes her depression makes it harder for her to remember things and sometimes contributes to her becoming confused.  (*Id.*).  Claimant explained that Dr. Patterson, her general practitioner, had prescribed an anti-depressant for her, but she "couldn't tolerate it." (*Id.*).  She has been on and off different anti-depressants, the most recent of which she has been taking for about two months.  (*Id.*). Claimant sees her mother three to four times a week.  (R. 34).   Her sister, niece, and nephew occasionally come to claimant's house to visit.  (*Id.*).  Claimant testified that she does not belong to any social organizations and that she does not have problems getting along with other people. (*Id.*).

Claimant's daily routine involves waking up in pain around 9:00 AM and fixing breakfast right away.   (R. 27-28).  She takes all her pain medications with breakfast

and lies back down at 9:45 AM until the medications take effect.  (R. 28).   Claimant gets up twenty to thirty minutes later and performs stretching exercises because the pain in her lower back makes her hip flexor muscle tight.  (*Id.*).  At about 10:15 AM, she might clean the kitchen and do other household cleaning as her pain allows.  (R. 29).  By 10:45 AM, she sits down and watches television.  (*Id.*).  At about 11:30 AM, she stands up and does laundry.  (*Id.*).  She then fixes her lunch and takes her medications with food again around noon.  (*Id.*).  After lunch, claimant testified that she will do some light housework until about 1:00 PM, depending on her pain.  If she is feeling alright, claimant will take a drive to her mother's house, visit, and return to her home between 2:30 and 3:00 PM.  (R. 30).  She takes a nap for 45 minutes to an hour, wakes up, and finishes her laundry; she folds her clothes while sitting.  (R. 31).  She starts preparing supper at around 4:00 or 4:15 PM and eats around 5:00 PM.  (*Id.*).  She takes more pain medication with supper, after which she lies down for about 25 minutes.  (*Id.*).  At about 5:45 PM, she puts her dishes in the dishwasher, and at about 6:00 PM, she takes a shower.  (*Id.*).  Claimant testified that after her shower, she sits and either watches television or reads for the rest of the night until she goes to sleep at 11:00 PM.  (R. 32).

Claimant is able to dress, groom, and bathe herself.  (*Id.*).  Her husband helps her grocery shop once a week, and she cannot vacuum.  (*Id.*).  She likes to read, but does not do any physical activity other than her physical therapy exercises.  (R. 33).  She estimates that she can lift maybe three pounds.  (R. 35).  When driving, she does not have a problem physically steering the wheel or pushing the pedals.  (R. 40).  Claimant explained that she has a hard time grasping things, especially with her right hand, and has problems opening jars, opening doors, and turning her hands.  (R. 41).

19

Claimant testified that she did not know how much she could walk within an eight hour period of time; that she could stand for a total of roughly thirty minutes within an eight hour period; and that she could sit for more than four hours within an eight hour period. (R. 39-40).

One day after the hearing had concluded, claimant submitted a handwritten note to ALJ Pope that further explained the phlebotomy treatment process and the treatment's alleged effects on claimant. (R. 330). In three sentences, claimant's note explained:

> This [note] is in regards to my phlebotomies that I have to have done every 2 weeks. It takes about ½ hour to draw my 500 cc's of blood from me. Then I have to sit [and] lie there and drink fluids for about an hour and a half (at least) till I can get up without being dizzy or lightheaded, sometimes longer. Then I come home [and] rest and sleep for the rest of the day because that knocks me out.

(*Id.*).

### D.     Vocational Expert's Testimony

Ed Vagello testified as the vocational expert ("VE"). (R. 41). The VE described claimant's past work as a bartender as light, low-end, and semi-skilled. (R. 43). Claimant did not have any other jobs or past work experience that the VE evaluated. (*Id.*).

The ALJ asked the VE to consider a hypothetical person with the same age, education, and past relevant work as claimant. (R. 43). The ALJ then asked the VE to assume that the individual was limited to light work with only the occasional climbing of ladders, ropes, or scaffolds; the occasional stoop, kneel, crouch, or crawl; the frequent climbing of ramps and stairs; and the frequent use of balance. (*Id.*). The VE explained

that such an individual could perform claimant's past work as a bartender.  (*Id.*).  The VE also testified that such an individual's work related skills were not transferable, but such an individual could perform a wide variety of unskilled, light occupations.  (R. 44).

The ALJ then asked the VE to consider a second hypothetical person with the same age, education, and past relevant work as claimant.  (R. 44).  This second individual had the same limitations on her work except she also was limited in that she could only "occasionally handle, finger, and feel with the right upper extremity," which in the hypothetical, was also the individual's dominant hand.  (*Id.*).  The VE explained that there are three classifications of unskilled, light occupations: (1) manufacturing jobs, (2) clerical occupations, and (3) service occupations.  (*Id.*).  The VE also testified that these three groups of occupations would require that the individual have the ability to utilize her upper extremities, most importantly her dominant upper extremity, to perform more than the occasional writing, fingering, and feeling throughout the course of a work day.  (*Id.*).  Therefore, the individual in the second hypothetical could not perform any unskilled, light occupations.  (*Id.*).

The ALJ then continued with a third hypothetical in which the individual in the second hypothetical and third hypothetical were identical except that the third individual could frequently—rather than occasionally—"handle, finger, and feel" with the dominant, right upper extremity.  (R. 44).  The VE testified that the third individual could perform claimant's past relevant work as a bartender as well as a wide variety of unskilled, entry-level jobs.  (R. 45).  The VE also testified that in the Chicago region, there are 217,868 unskilled, light-level positions.  (*Id.*).  The hypothetical third individual could perform at least 190,000 of these jobs.  (R. 46).  The VE provided the following

examples of unskilled, light positions that the third individual could perform: 970 usher positions; 12,000 cashier positions; and 10,000 office helper positions. (R. 45). If the individual in the third hypothetical was also limited to sedentary work, she could still perform more than 20,000 jobs. (R. 46).

The VE further testified that if the ALJ found claimant totally credible and also found all of her claimed impairments supported by medical evidence, claimant would not be able to perform any jobs. (*Id.*). The VE based this testimony on claimant's claims that she is fatigued all the time and only able to lift up to three pounds on an occasional basis, which would put claimant at a less than sedentary level of physical tolerance. (*Id.*). Finally, the VE testified that all the jobs he cited in his testimony were consistent with the descriptions in the *Dictionary of Occupational Titles* and the *Selected Characteristics of Occupations*. (*Id.*).

## II. LEGAL ANALYSIS

### A. Standard of Review

We must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). We must consider the entire administrative record, but we will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (quoting *Clifford*

*v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). We will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Id.* While the ALJ "must build an accurate and logical bridge from the evidence to [his] conclusion," he need not discuss every piece of evidence in the record. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The ALJ must "sufficiently articulate his assessment of the evidence to 'assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning.'" *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

### B.    Analysis Under the Social Security Act

Whether a claimant qualifies to receive disability insurance benefits depends on whether claimant is "disabled" under the Social Security Act. A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether she can perform her past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon*, 270 F.3d at 1176. Claimant has the burden of establishing a disability at steps

one through four. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001). If claimant

reaches step five, the burden then shifts to the Commissioner to show that "claimant is

capable of performing work in the national economy." *Id.* at 886.

The ALJ followed this five-step analysis. At step one, the ALJ found that claimant

had not engaged in substantial gainful activity since the alleged onset date of the

disability, June 30, 2005. (R. 55). At step two, the ALJ found that claimant's severe

impairments included degenerative disc disease, hemochromatosis, and arthritis. (*Id.*).

At step three, the ALJ determined that claimant does not have "an impairment or

combination of impairments that meets or medically equals one of the listed

impairments in 20 CFR Part 404, Subpart P, Appendix 1." (*Id.*). Next, the ALJ adopted

Dr. Bernet's physical RFC assessment finding that claimant had the physical RFC "to

perform light work . . . not requiring more than the occasional climbing of ladders, ropes

or scaffolds, stooping, kneeling, crouching and crawling." (R. 60). In adopting Dr.

Bernet's RFC assessment, the ALJ also found that claimant "can frequently climb ramps

and stairs, balance and handle, finger and feel with her right upper extremity." (*Id.*).

Further, the ALJ found that claimant's testimony regarding the frequency and severity of

her symptoms was not fully credible or supportive of any greater limitations than those

included in claimant's RFC assessment. (*Id.*). At step four, the ALJ determined that

claimant could perform her past work as a bartender. (*Id.*). In the alternative, at step

five, the ALJ found that there were a significant number of jobs in the national economy

that claimant could perform. (R. 61).

Gallo argues that the ALJ erred in failing to consider all of her medically

determinable impairments, specifically her PCT diagnosis and the effects of its resulting

phlebotomy treatments. Claimant also contends that the ALJ erred by rejecting uncontradicted evidence in the record, specifically claimant's testimony and her supplemental handwritten note concerning phlebotomy treatments. Finally, claimant argues that the ALJ's decision was not supported by substantial evidence because the ALJ's hypothetical question to the VE neither included claimant's PCT diagnosis nor the effects of its resulting phlebotomy treatments on claimant.

### C. The ALJ did not err in considering the medical evidence.

Gallo argues that the ALJ erred in failing to consider evidence of her PCT diagnosis and the effects of her alleged bimonthly phlebotomy treatments. The Commissioner responded that the ALJ adequately considered claimant's PCT diagnosis and was not required to specifically consider claimant's alleged bimonthly phlebotomy treatments because the medical evidence shows that claimant received only one phlebotomy treatment. We agree. An ALJ is not required to address every piece of testimony and evidence. *Carroll v. Barnhardt*, 291 F.Supp.2d 783, 798 (N.D. Ill. 2003) (citing *Stephens*, 766 F.2d. at 287). However, an ALJ may not select and discuss only that evidence which favors his ultimate conclusion, but must minimally articulate his analysis of the evidence so that we may trace the path of his reasoning. *Diaz*, 55 F.3d at 307.

Claimant contends that in merely using the words "porphyria cutanea tarda" in his decision, the ALJ failed to minimally articulate his justification for rejecting evidence of the disabling effects of claimant's PCT. Claimant cites one sentence in *Pope v. Shalala*, 998 F.2d 473, 481 (7th Cir. 1993) *overruled on other grounds by Johnson v. Apfel*, 189 F.3d 561, 562-63 (7th Cir. 1999) to support this proposition. We disagree with

claimant's interpretation of *Pope*. As in this case, the claimant in *Pope* argued that "the ALJ did not specifically state in what way the evidence was deficient." *Id.* at 481. The *Pope* court stated that an ALJ is only required to "minimally articulate his or her justification for rejecting or accepting specific evidence of disability" and that "[the ALJ] need not provide a written evaluation of every piece of evidence that is presented.'" 998 F.2d at 481 (quoting *Steward v. Bowen*, 858 F.2d 1295, 1298 (7th Cir. 1988). Additionally, the *Pope* court found that the ALJ did minimally articulate his justifications for rejecting specific evidence when he generally referred to the claimant's impairments as impairments that do not reach the level of disability. *Id.*

Here, the ALJ considered both claimant's PCT diagnosis and, more generally, her "hematological disorders" in coming to his determination. (R. 55, 57, 59, 60). The ALJ acknowledged that claimant was medically diagnosed with two blood disorders, PCT and hemochromatosis. (R. 55, 57, 59, 60). He also recognized that claimant had suffered from blisters. (R. 57). Moreover, the ALJ found that claimant's physical impairments stemming from her blood disorders did not meet or equal the requirements of applicable Listing 7.00 (hematological disorders). (R. 55); *see* 20 C.F.R. pt. 404, subpt. P, app. 1 (2009).

As in *Pope*, the ALJ in this case considered the claimant's impairments generally, finding that the claimant "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (R. 55). In addition, he specifically referred to the claimant's "blisters," "blood disorder," and "porphyria cutanea tarda" in his decision. (R.56, 57, 59). Like the general consideration of impairments in *Pope,* the ALJ's analysis here is

26

sufficient to minimally articulate his justifications for rejecting claimant's PCT diagnosis and alleged phlebotomy treatments as evidence of a disabling impairment.

Additionally, the ALJ found that "nothing in the record preclud[ed] claimant from performing competitive work on a sustained basis at the light exertional level." (R. 60). In a general sense, "nothing in the record" includes claimant's testimony regarding her phlebotomy treatments and their effects which allegedly contributed to her claimed disability. (R. 25-26, 330). Therefore, we find that the ALJ did not err in considering medical evidence. Accordingly, we will not remand on that basis.

Even if we find that ALJ Pope failed to consider claimant's PCT diagnosis or the effects resulting from its treatment – which we do not – such a failure would, at most, constitute harmless error. The doctrine of harmless error is fully applicable to judicial review of administrative decisions. *Keys v. Barnhart*, 347 F.3d 990, 994 (7th Cir. 2003). The doctrine of harmless error prevents the remand of claims that would not affect the outcome of the case. *See Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006). Nothing in the medical records suggests that a physician indicated that claimant's PCT diagnosis and resulting phlebotomy treatment either exacerbated her physical impairments or physically limited her in any way.

Claimant alleges that blisters resulting from her PCT contributed to her disability. However, she did not explain how the blisters resulted in her inability to work. A mere diagnosis of some disorder, however serious, does not necessarily cause disability under the Social Security Act. *See Jones v. Shalala*, 10 F.3d 522, 525-26 (7th Cir. 1993) (holding that a claimant limited to the use of only one arm is not automatically entitled to disability benefits, even if the impaired arm is accompanied by pain). There

27

is no medical evidence in the record that the blisters on claimant's right hand lasted more than three months or that the blisters ever returned after they healed. Similarly, there is no medical evidence in the record that claimant ever had blisters on her left hand.

Claimant also alleges that scheduled phlebotomy treatments caused her to miss two full days of work per month and thus contributed to her inability to work. However, claimant presents no evidence that her scheduled phlebotomy treatments would actually cause her to miss work. Moreover, the medical evidence in the record shows that claimant received this "disabling" treatment only once. Specifically, the medical evidence reveals that on October 30, 2007, Dr. Rao directed claimant to undergo a 500 milliliter phlebotomy treatment every week for four weeks. (R. 299). Claimant received one phlebotomy treatment sometime between October 30, 2007 and November 27, 2007. (R. 296). On November 27, 2007, claimant reported to Dr. Rao that she had developed hypotension at her first phlebotomy and had refused to undergo additional phlebotomy treatments. (*Id.*). Despite Dr. Rao's continued recommendations, claimant never received another phlebotomy treatment after the first. (R. 295-296). Eventually, Dr. Rao recommended taking medication to relieve claimant of excess iron in her blood as an alternative to phlebotomy treatments. (R. 295).

Because claimant has not presented adequate evidence that her PCT diagnosis or her phlebotomy treatment precluded her from working, any error that the ALJ might have made by not specifically referring to either would be harmless.

**D.    The medical evidence is not consistent with claimant's testimony.**

Claimant contends that the ALJ erred by rejecting "uncontradicted" evidence

28

concerning her phlebotomy treatments, specifically claimant's testimony and her supplemental handwritten note.  We disagree.  Both claimant's testimony and the claims in her supplemental note concerning her phlebotomy treatments are inconsistent with the medical evidence in the record as is detailed in section II, C.  Further, ALJ Pope considered claimant's testimony and, based on his review of the medical evidence and Dr. Bernet's physical RFC assessment, "did not find the claimant's testimony regarding the severity or frequency of her symptoms to be fully credible."  (R. 60).  Accordingly, we will not remand on this basis.

**E.      The ALJ did not err in his hypothetical questions to the vocational expert.**

Finally, claimant contends that because the ALJ's hypothetical questions to the VE did not address the effects of phlebotomy treatments on the claimant, the VE's testimony cannot constitute substantial evidence. We disagree.  An ALJ is not required to include a claimant's alleged limitations in his hypothetical to a VE if the alleged limitations are not found in the medical reports in the record.  *See Ehrhart v. Secretary of Health and Human Services*, 969 F.2d 534, 540 (7th Cir. 1992) (holding that the hypothetical question posed by the ALJ was proper because it reflected plaintiff's impairments to the extent that the ALJ found them supported by medical evidence in the record).  The only requirement in questioning a VE is that "the hypothetical question be supported by the medical evidence in the record."  *Id.* (quoting *Meredith v. Bowen*, 833 F.2d 650, 654 (7th Cir. 1987).  As previously discussed in sections II, C and II, D, the alleged frequency of claimant's phlebotomy treatments in both her testimony and her supplemental handwritten note is inconsistent with the medical reports in the record.

Therefore, ALJ Pope was not required to include any information about phlebotomy treatments in his hypothetical questions to the VE.

Moreover, ALJ Pope afforded claimant's counsel opportunity to question the VE herself at the hearing. (R. 46-47). At that time, claimant could have asked the VE any hypothetical question she wished, including one involving a woman who had been diagnosed with PCT and was undergoing phlebotomy treatments. (R. 46-47). Claimant's counsel declined to ask the VE any questions at all. (*Id.*). Accordingly, we will not remand on this basis.

## III.  CONCLUSION

For the reasons set forth above, Gallo's motion for summary judgment is denied. The Commissioner's motion for summary judgment is granted. It is so ordered.

**ENTERED:**

**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated: July 20, 2010**